UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HORNBECK OFFSHORE SERVICES, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO: 09-2905** |
| **FAIRFIELD INDUSTRIES, INC.** | SECTION: "C" (4) |

## ORDER AND REASONS

Before the Court are Motions for Summary Judgment by Fairfield Industries ("Fairfield") and Fearnley Offshore L.L.C. ("Fearnley") (Rec. Docs. 53, 132) and a Motion for Partial Summary Judgment by Hornbeck Offshore Services, L.L.C. ("Hornbeck"). (Rec. Doc. 66).

The motions are before the Court on the briefs without oral argument. Having considered the memoranda of counsel, the record, and the applicable law, the Court GRANTS Hornbeck's Motion for Partial Summary Judgment ; DENIES in Part and GRANTS in Part Fairfield's Motion for Summary Judgment, and GRANTS Fearnley's Motion for Summary Judgment, for the following reasons.

**I. Background**

Fairfield is a specialty seismic data gathering company. In October 2008, Fairfield began soliciting offers for a time charter of a vessel. Fairfield brought on Fearnley to operate as a broker in arranging the charter. Hornbeck submitted an offer for the HOS INNOVATOR, and

negotiations ensued. In the meantime, Fairfield was also pursuing negotiations with Edison Chouest Offshore ("Chouest"). Fairfield pursued the Chouest negotiations directly, without using Fearnley as an intermediary. Ultimately, Fairfield determined that Chouest offered the better terms.

Hornbeck brings this suit asserting that prior to Fairfield's informing Hornbeck of its intention to charter with Chouest, the parties entered into a binding time charter. Specifically at issue is a December 11, 2008, email written to Hornbeck by Fearnley, and pre-approved by Fairfield management, which read as follows:

> On behalf of Fairfield Industries, we thank you for your revised offer dated November 26th, 2008, on the "HOS Innovator" and are pleased to accept your commercial terms and conditions except:
> **ON HIRE DATE:**
> Commencement window 15th March to 15th April 2009 with the following notifications scheme . . .
> **CONTRACT FORM:**
> BIMCO SUPPLY TIME 2005 - To be mutually agreed and logical amended for this charter. Please forward your standard BST05 proposal.
> **HORNBECK ADDITIONAL CONDITIONS:**
> Fairfield are currently reviewing these terms and will revert shortly with any comment or request for changes/amendments.
> **SUBJECTS:**
> Fairfield management approval of final agreed contract terms. Fairfield management will be available to approve and sign a contract week 1 or 2 of the new year.

(Rec. Doc. 53-5 at 1). Hornbeck argues that this email constitutes the formation of a binding fixture. Fairfield argues that under traditional contract principles, no fixture was formed because the email indicated that the agreement was subject to approval by Fairfield management. As discussed in detail below, each party cites additional circumstances that they claim prove that the parties intended, or did not intend, to form a binding agreement.

Fairfield has also brought a third party complaint against Fearnley, claiming that it acted

2

negligently in its role as a broker. Fearnley, as third party defendant, moves for summary judgment, arguing that, under the undisputed facts, it cannot be held liable under applicable agency law.

**II. Law and Analysis**

*a. Standard of Review*

Summary judgment is only proper when the record indicates that there is not a "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine issue of fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 247-48 (1986); *see also, Taita Chem. Co. v. Westlake Styrene Corp*., 246 F.3d 377, 385 (5th Cir. 2001). When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on "unsubstantiated assertions" and "conclusory allegations." *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *Lujan v. Nat'l. Wildlife Fed'n.*,

497 U.S. 871, 871-73 (1990); *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992).

b. *Choice of Law*

The Court must first address the choice of law question. Fairfield argues that general contract law applies, and quotes extensively from Louisiana caselaw and the Louisiana code on contracts. Hornbeck argues that maritime contract law, which differs, must apply.

"Where issues arise concerning the formation of a charter party, they are resolved by applying federal maritime law, not the law of particular states. However, the federal maritime law includes general principles of contract law and agency." 2 T. Schoenbaum, Admiralty and Maritime Law § 11-2 (4th ed. 2004). *See also Greenslate v. Tenneco Oil Company*, 623 F.Supp. 573, 575 (E.D.La. 1985) ("It is well established that a charter agreement is a maritime contract whose interpretation is subject to the principles of federal maritime law."); *Jambon & Associates, L.L.C. v. Seamar Divers, Inc.*, 2009 WL 2175980 at *6 (E.D.La. 2009) (reaching the same conclusion).

Thus, while Fairfield is correct that some general principles of contract law apply, Louisiana contract law does not control. The Court will apply maritime contract law.

c. *Breach of Contract Claims*

"A charter party is formed when the parties have a meeting of the minds on the essential terms of the charter." *E.A.S.T. Inc. of Stamford Conn. v. M/V ALAIA*, 673 F.Supp. 796, 799 (E.D.La. 1987). This takes place in two stages. *P.E.P. Shipping (Scandinavia) APS v. Noramco Shipping Corp.*, 1997 WL 358118 at *2 (E.D.La 1997); *Great Circle Lines, LTD v. Matheson &*

4

*Co., LTD*, 681 F.2d 121, 124 (2d. Cir. 1982). First is an agreement on the "main" or "essential" terms of the charter. *Great Circle*, 681 F.2d at 125. This agreement is termed a "fixture." *Id.* The fixture itself is a binding contract, even if it is "subject to details." *Id.* Second, the parties negotiate the details, "amending the form contract specified in the 'fixture.'" *Id.* To determine whether a phrase such as "subject to details" in a fixture creates a condition subsequent to a binding agreement or simply an indication of the remaining topics for negotiation, courts must look to "the intent of the parties when viewed in a fair and reasonable manner under all circumstances." *Id.* at 126.

Some courts and commentators have criticized the above rule – that a fixture is binding even if it is subject to details – with one commentator calling it "particularly troublesome." Schoenbaum, *supra*, § 11-2, p. 6. Indeed, English courts have explicitly criticized the American courts' practice of holding such a fixture binding. *Id.* But a leading treatise on maritime law notes that the fixture formation rules stem from "long-standing customs and business practices of the shipping industry" in which "[c]harters are frequently negotiated with a sense of urgency and under severe time constraints." *Id.* at 4.

Fairfield argues that in the interest of uniformity in international maritime law, the Court should "look to London" (Rec. Doc. 123 at 9) and hold that an agreement subject to details is not binding. It is not this Court's place to do so. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 149 (2d Cir. 2001) ("Unpopular though it may be, *Great Circle Lines* is binding precedent"). Federal maritime law is clear that fixtures subject to details are binding.

The Court must therefore determine if the parties agreed to a fixture in the instant case.

5

In *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, the parties agreed to a charter party via a "recap" to the parties' main terms, but subject to details. The details included "approval by Titan's board of directors of the proposed charter within 3 days of receipt of the drydock inspection report." 241 F.3d at 150. The court concluded that the fixture was binding, and "if Titan's board did fail to timely approve the charter, such failure would not prevent or undo formation of the charter party." *Id.* Instead, it would "constitute a breach of the charter party." *Id.*

Fairfield argues that the more comparable case is *Andolina Shipping, Ltd. v. TBS Eurolines, Ltd.*, 84 F.Supp.2d 527 (S.D.N.Y. 2000). There, the court rejected the plaintiff's argument that a fixture subject to the detail of reconfirmation had been created, finding instead that reconfirmation of the fixture was a condition precedent to formation of the charter party. *Id.* at 530. The court found that the parties' mutual expectations about the reconfirmation – and particularly the plaintiff's expectations – distinguished that case from *Zhen Hua. Id.*

Fairfield also notes that unlike the fixtures in the cases cited by Hornbeck, the alleged fixture between Fairfield and Hornbeck did not involve urgent negotiations with imminent voyages. (Rec. Doc. 123 at 7); *see Great Circle*, 681 F.2d at 123; *E.A.S.T. Inc.*, 673 F.Supp. at 798-99. As such, Fairfield suggests that the traditional need for a fixture to move the process forward prior to settling on charter party terms was unnecessary in this case, and therefore the parties did not expect the December 11 email to be binding.

Finally, Fairfield lists several facts or circumstances that it argues support its claim that there was a mutual expectation that the December 11 email was not binding:

    1. A December 15, 2008 internal email in which Ben Todd of Hornbeck informed a

6

colleague that they had been awarded the Fairfield charter "subject to a mutually agreeable contract and their management approval." (Rec. Doc. 123 at 9).

2. That because the national economic situation was worsening in the fall of 2008, Fairfield was reconsidering the viability of its project and would not have intended to agree to a binding fixture in December 2008. (Rec. Doc. 123 at 13).

3. Communications from Frederik Andersen of Fearnley to Jim Thompson of Fairfield, in January 2009 urging that the Hornbeck charter be completed quickly to avoid complications. (Rec. Doc. 53 at 11).

For its part, Hornbeck points to alternate indicia that the parties did consider the December 11 email as establishing a binding fixture:

1. A December 9 email from Thompson, of Fairfield, to Fairfield upper management requesting approval before authorizing Andersen, of Fearnley, to send the December 11 acceptance email to Hornbeck. (Rec. Doc. 103 at 4). That email read: "This is the best vessel I have found in the market . . . I will need to lock down the vessel just after the New Year." (Rec. Doc. 103-2 at 40).

2. A December 9 email from Andersen to Thompson reading: "I would like send the below to Hornbeck in order to start negotiating and firming up the vessel for you. . . . By sending the below you agree to their main terms such as dayrate, delivery port etc as per first page of their offer, but leaves the Bimco and their terms open for negotiations and it will all be subject to you receiving approval from your management." (Rec. Doc. 103-3 at 79).

3. The belief that Fairfield's request for Auto CAD drawings of the aft deck confirmed

7

the existence of an agreement. (Rec. Doc. 103 at 6).

4. Fairfield's alleged intentionally misleading statements to Fearnley regarding its plans:

> Q: "... it didn't happen because you were leading Mr. Andersen [of Fearnley] to believe that you-all had a deal on this boat, right?
>
> A [by Fairfield representative]: At this time, yes.

(Rec. Doc. 108-2 at 4).

The December 11 email at issue indicated that the acceptance was subject to "Fairfield management approval of *final agreed contract terms*." (Rec. Doc. 53-5 at 1). This suggests that management did approve of the previously conveyed commercial terms and conditions, and that it was the final terms, the details, which required further management approval. The "subject" at issue in *Zhen Hua* was quite similar: "U.S. Titan [Board of Directors] Approval within 3 days following receipt of their Denholm Inspection Report." 241 F.3d at 139. Furthermore, in *Zhen Hua* the opening language of communication was ambiguous: "We are pleased to Recap Owner's and Charterer's Agreement as follows." *Id.* That court nonetheless found the recap to constitute an acceptance of the fixture terms. Here, the email was more explicit, opening by conveying that Fairfield was "pleased to accept [Hornbeck's] commercial terms and conditions." (Rec. Doc. 53-5 at 1).

The internal emails quoted above and cited by both parties indicate, perhaps, a subjective intent on the part of Fairfield not be bound. But it is their manifested intent that controls, and under maritime contract law, their communications to Hornbeck via Fearnley evidenced an intent to be bound by the December 11 email. *See* 1 Richard A. Lord, *Williston on Contracts* § 3:5 (4th ed. 2010) ("real but unexpressed intention is irrelevant"); *Great Circle*, 681 F.2d at 126 ("the

8

outcome of continuing negotiations over details is in no way a condition subsequent").

Partial summary judgment in favor of Hornbeck on the issue of breach of contract is GRANTED.

*d. Detrimental Reliance Claims*

Fairfield also moves for summary judgment on Hornbeck's detrimental reliance claim. (Rec. Doc. 53 at 13). Because the Court finds that the December 11 email created a binding fixture, Hornbeck's alleged reliance was justified. Summary judgment is DENIED.

*e. Unjust Enrichment Claims*

Similarly, because the Court finds that the December 11 email created a binding fixture, "the law provides another remedy" for Hornbeck, and an unjust enrichment claim is not available. La. Civ. Code Ann. art. 2298 (West 2010). Summary judgment is GRANTED.

*f. Fearnley's Motion for Summary Judgment*

Fearnley moves for summary judgment on Fairfield's third party claim. (Rec. Doc. 132). As detailed above, Frederik Andersen of Fearnley was the broker for the deal between Fairfield and Hornbeck. Fairfield argues that Andersen exceeded his authority or violated his duties as an agent by accepting a binding fixture on their behalf.

Fairfield argues that Andersen breached his duties as an agent, as expressed by the Restatement (Third) of Agency § 8.08: "If an agent claims to possess special skills or knowledge, the agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents with such skills or knowledge." (Rec. Doc. 143 at 7).

Fearnley refutes Fairfield's claims, noting that Jim Thompson of Fairfield expressly approved the email Andersen sent to Hornbeck. (Rec. Doc. 146 at 6). Furthermore, Thompson

9

acknowledged that he checked with his upper management before he authorized Andersen to send the email and that he led Andersen to believe they had a deal. (Rec. Doc. 146-2 at 7-9).

The Court concludes that Fearnley simply followed Fairfield's instructions in sending the verifying email. No negligence or misrepresentation has been established. Fearnley's motion is GRANTED.

Accordingly,

IT IS ORDERED that Hornbeck's Motion for Partial Summary Judgment is GRANTED; Fairfield's Motion for Summary Judgment is DENIED as to the breach of contract and unjust enrichment claims and GRANTED as to the detrimental reliance claims; and Fearnley's Motion for Summary Judgment is GRANTED.

New Orleans, Louisiana, this 17th day of May, 2010.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**